## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 10 2019, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEY FOR APPELLEES

R. Patrick Magrath
Madison, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Adoption of A.D.B. (Minor Child):

B.B.,

*Appellant-Respondent,*

v.

J.J. and S.J.,

*Appellees-Petitioners.*

December 10, 2019

Court of Appeals Case No.
19A-AD-1219

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No.
15C01-1802-AD-1

**Bailey, Judge.**

# Case Summary

B.B. ("Mother") challenges the trial court order granting J.J.'s and S.J.'s ("Adoptive Parents") petition to adopt Mother's child A.D.B. ("Child") without Mother's consent.

We affirm.

# Issues

Mother raises two issues on appeal which we restate as follows:

1. Whether Mother was properly served with the Notice of Adoption under Indiana Trial Rule 4.1(B) such that her consent to adoption was irrevocably implied under Indiana Code Section 31-19-9-18 when she failed to file a motion to contest the adoption by July 20, 2018.

2. Whether Mother's consent to adoption was not required under Indiana Code Section 31-19-9-8 because she abandoned Child.

# Facts and Procedural History

Mother and D.H. ("Father")[1] are the biological parents of Child, who was born on September 7, 2009. On Easter Sunday in 2014, when Child was four years old, Mother left her with Child's maternal grandmother. After receiving reports

---

[1] Father consented to the adoption and does not participate in this appeal.

regarding Child, the Lawrenceburg Police Department ("LPD") went to maternal grandmother's apartment complex and found Child in the parking lot, wearing only her underwear and covered in dirt and feces. LPD and the Department of Child Services ("DCS") called S.J., Child's maternal cousin, to inform her of Child's condition and whereabouts. Adoptive Parents, who are married, then went to the maternal grandmother's apartment complex and, with permission from DCS, took Child home with them. At that time, Child had scraped knees, feces caked in her underwear, sticks and leaves matted in her hair, and bleeding feet. J.J. described her as "feral" at that time, and noted that she was emotionally vulnerable, prone to fits of violence and hysterics, and frequently attempted to engage in self-harm. Tr. Vol. II at 36. Child urinated and defecated on Adoptive Parents' floors, leading J.J. to believe Child did not "understand how to use indoor plumbing." *Id*. at 37. J.J. believed that Child had been physically and sexually abused while in Mother's care, based on Child's statements to Adoptive Parents and her knowledge of "the male anatomy" at such a young age. *Id*. at 38.

[5]     In June of 2014, S.J. became Child's permanent guardian. Soon thereafter, Adoptive Parents obtained therapeutic services for Child. Those services included parent-child interactive therapy, individual counseling, and medication therapy. Initially, Child was diagnosed with reactive attachment disorder, but she was later diagnosed with post-traumatic stress disorder and attention deficit hyperactive disorder. Adoptive Parents wished to enroll Child in a recommended behavioral occupational therapy program with psychology

specialists at Cincinnati Children's medical center but could not get those services covered by J.J.'s insurance until adoption was final.

[6] Adoptive Parents arranged for Mother to see Child on Mother's Day in 2014. Mother said she was taking Child out for ice cream. Six hours later, Child was returned to Adoptive Parents by strangers who reported Mother had disappeared at a casino, leaving the Child behind. Shortly thereafter, Mother was charged, convicted and incarcerated for theft. The theft conviction was Mother's seventh criminal conviction and her second felony conviction.

[7] When Mother was released from incarceration in March of 2015, Adoptive Parents provided her with a path to reunification with Child by arranging for her to work with Child's therapists. Mother attended two appointments with Child's therapist and then refused to follow through with additional appointments or recommendations. In July of 2015, Mother filed a motion to modify the guardianship orders. Adoptive Parents submitted into evidence at the guardianship proceedings a report from Child's psychiatrist stating:

> [Child] is a 6-year-old biracial youngster whose behavior gives ample evidence of significant maternal neglect. There is substantial and ample indication that the biological mother never made any emotional attachment to [Child]. [Mother's] behavior clearly indicates that she has a serious personality disorder that is not likely to change.
>
> My professional opinion is that [Child] should not have any form of contact with biological mother till she is at least 18 years of age and is able to make a mature decision about initiating any contact. Contact with her biological mother serves no purpose

other than dredging up old painful memories and more acting out behavior.

Ex. at 36.[2]  On January 28, 2016, based in part on the psychiatrist's report, the guardianship court denied Mother's request to modify the guardianship.  The court ordered contact between Mother and Child "at the sole discretion" of S.J. *Id*. at 35.

[8] Following the guardianship court's decision, Mother made no effort to contact Child or Adoptive Parents again.  Since Mother's Day of 2014, Mother has had no contact with Child.  Since January of 2016, Mother has not tried to contact Child.  Mother admitted that Adoptive Parents never told her she could not have contact with them or Child.  Mother knew Adoptive Parents' address, which has not changed since Child began living with Adoptive Parents, and Mother owned a car, so she had transportation available.

[9] During the period between April of 2014 and February of 2018, Mother was employed at various places, including McDonalds, Burger King, Dunkin Donuts, a garden center, Chipotle, Little Caesars, and two factories.  Between April of 2014 and March of 2019, Mother also continued to receive child support from Father which totaled approximately $3,000.00.  However, Mother

---

[2]  A copy of the report was also submitted into evidence, without objection, as Exhibit 5 at the April 2, 2019, final hearing on adoption.  Tr. at 84

has not provided money, clothing, food, or other support for Child since Child began living with Adoptive Parents.

[10] Adoptive Parents enrolled Child in a private school, and paid for the same, in order to give Child the attention she needs as recommended by her counselor. Neither Adoptive Parent has a criminal history. Adoptive Parents have a home for Child, medical insurance for Child, and income to support Child. A Home Study completed by Protect Our Children, Inc. was submitted to the court and recommended approval of the adoption.

[11] On February 27, 2018, Adoptive Parents filed a petition to adopt Child. The petition alleged that Mother's consent to the adoption was not required under Indiana Code Section 31-19-9-8(a). On June 18, 2018, after several failed attempts to serve Mother, Adoptive Parents served Mother with the Notice of Adoption and Petition for Adoption by the Sheriff's department leaving a copy of the same at 7399 U.S. Highway 50, Lot 20, Aurora, Indiana. That address had been provided to S.J. by a family member, and it was the same address listed on a traffic ticket issued to and paid by Mother in May of 2018.

[12] On September 7, 2018, Adoptive Parents filed Father's consent to the adoption. On December 5, 2018, Adoptive Parents filed a request for a final hearing in which they noted that Mother had been served by Sheriff on June 20 but failed to file a motion to contest the adoption, making her consent irrevocably implied under state law. Adoptive Parents' request and the order setting the final

hearing date for January 17, 2019, were mailed to Mother at the same Aurora, Indiana address.

[13] On January 14, Mother filed a letter requesting a continuance of the final hearing and an opportunity to contest the adoption. The letter referred to the December 5 request for final hearing and stated that Mother "had absolutely no knowledge of this adoption until [she] just read [the request for hearing] late last week." App. Vol. II at 48. Mother denied that she was ever served on June 20, 2018.

[14] On January 16, Adoptive Parents filed, by counsel, an objection to Mother's motion for a continuance. The objection stated that, in addition to service by Sheriff on June 20, 2018: "Pursuant to Rule 4.1(B) of the Indiana Rules of Trial Procedure, counsel for the Petitioners mailed a copy of the Verified Petition and the Notice of the Adoption to [B.B.] at 7399 U.S. Highway 50, Lot 20, Aurora, Indiana 47001 on the 26th day of June, 2018." *Id*. at 51. The objection was not in the form of an affidavit, nor was it otherwise verified. On January 17, Adoptive Parents and their counsel appeared but Mother did not. Counsel for Adoptive Parents noted the service by Sheriff on June 20 and stated to the court that he "personally sent a mailed copy of the notice of adoption as well as the verified petition" to the same Aurora, Indiana address on June 26, 2018, and that those documents were not returned to him as undeliverable. Tr. at 5. The trial court did not take evidence at that time; rather, it granted Mother's request for a continuance and set the matter for a pretrial hearing on January 25, and a final hearing on March 1.

[15]     Mother filed a request to continue the January 25 pretrial hearing and the court denied that request. On January 25, the court held the pretrial hearing and Mother failed to appear. On January 30, on its own motion, the trial court appointed counsel for Mother and "direct[ed]" Mother to contact her counsel at the provided telephone number within five business days. App. Vol. II at 62. The trial court granted Mother's additional request for a continuance of the final hearing and rescheduled the same for March 15. On March 14, Mother's counsel filed another request for a continuance of the final hearing because she had "just met with her client on March 13." *Id*. at 65.

[16]     On March 15, the court held a hearing on all pending motions. All parties and their counsel were at the hearing. The court denied Mother's request for a continuance and proceeded to the final hearing at which J.J. testified. The hearing was continued to April 2, 2019, and all parties appeared with counsel at that hearing. S.J. testified and Mother testified. At the recommended hearing on April 4, Mother's counsel appeared but Mother did not. Adoptive Parents testified again. In an order dated April 4, the trial court held that Mother's consent was irrevocably implied under Indiana Code Section 31-19-9-18(b)(1) and, in the alternative, not required under Indiana Code Section 31-19-9-8 for several reasons, including Mother's abandonment of Child. In an order dated April 12, the court held that Mother's motion to contest the adoption was denied. On April 29, the court completed the final hearing on the adoption petition and issued the Decree of Adoption.

[17]     Mother now appeals.

# Discussion and Decision

## Standard of Review

[18] Our standard of review of a trial court's ruling in an adoption proceeding is well-settled.

> [W]e will not disturb that ruling unless the evidence leads to only one conclusion and the trial court reached the opposite conclusion. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900 (Ind. Ct. App. 2008), *trans. denied*. We will not reweigh the evidence, but rather, we will examine the evidence most favorable to the trial court's decision together with all reasonable inferences to be drawn therefrom. *Id.* We will affirm if sufficient evidence exists to sustain the decision. *In re Adoption of M.A.S.*, 815 N.E.2d 216 (Ind. Ct. App. 2004). The trial court's decision is presumed to be correct and it is the appellant's burden to overcome that presumption. *Id.*

*B.M. v. J.R. and M.R.* ("*In re Adoption of K.M.*"), 31 N.E.3d 533, 536 (Ind. Ct. App. 2015).

## Implied Consent

[19] Mother challenges the trial court's conclusion that her consent to the adoption was implied under state law. Generally, a petition to adoption a child may only be granted if the living biological parents have executed their written consent to the adoption. Ind. Code § 31-19-9-1(a). However, there are several statutory exceptions to the written consent requirement. One such exception is where the parent's consent is irrevocably implied. Under Indiana Code Section 31-19-9-18(b), a parent's consent to adoption is "irrevocably implied" when the parent

"fails to file a motion to contest the adoption … not later than thirty (30) days after service of notice" of the adoption. Under those circumstances, the parent loses "the right of action and the adoption may not be challenged." *In re Adoption of K.M.*, 31 N.E.3d at 538.

[20] The thirty-day time limit to contest adoption is triggered by service of the adoption notice. Service of process is governed by the Indiana Trial Rules. Pursuant to Trial Rules 4.1(A)(3) and 4.12(A), one of the ways to make service on an individual is by having the sheriff "leav[e] a copy of the summons and complaint at [the] dwelling house or usual place of abode" of the person to be served. Proof of such service must be made by return delivered to the trial court clerk. Ind. Trial Rule 4.15(A). When service is made in that manner, "the person making the service also shall send by first class mail a copy of the summons and the complaint to the last known address of the person being served, and this fact shall be shown upon the return." T.R. 4.15(B). Technically insufficient service under Trial Rule 4.1(B) may nevertheless be sufficient under Trial Rule 4.15(F) if the service is "reasonably calculated to inform the person to be served that an action has been instituted against him." *See also*, *LePore v. Norwest Bank Ind., N.A.*, 860 N.E.2d 632, 636 (Ind. Ct. App. 2007) (holding, when there is not "a complete lack of compliance with T.R. 4.1(B)" and there is proof of "substantial compliance," service may be sufficient pursuant to Rule 4.15(F)); *Joslyn v. State*, 942 N.E.2d 809, 812 (Ind. 2011) (holding failure to prove service by mail under Trial Rule 4.1(B) did not render

service insufficient where the person to be served admitted he had received actual notice by service delivered by a state agent to his home).

[21] Here, unlike the situations in the above-cited cases, Mother contends that she did not receive notice of the adoption action until sometime in January of 2018. She denies that she received the June 20 service by sheriff and that she received service purportedly mailed by Adoptive Parents' counsel on June 26. She notes that Adoptive Parents failed to comply with Rule 4.1(B) because they allege that mailed service was done by their attorney, not the sheriff who left the documents at her dwelling, as the Rule requires.[3] However, we could overlook that technical defect in service if there was any evidence that the Adoptive Parents' attorney had served Mother by mail – i.e., if there was evidence of "substantial compliance" with Trial Rule 4.1(B). *See LePore*. 860 N.E.2d at 636. However, unlike the situation in *LePore*, there is no such evidence in this case. The record does not contain a filed return of service or even a certificate of service done by the attorney. There is no affidavit or other verified document under which anyone swears to the truth of facts showing service by mail. The unverified contention in the Adoptive Parents' January 16 objection to the continuance and their attorney's unsworn statement to the court at the January 17 hearing are not "evidence." *See Gajdos v. State*, 462 N.E.2d 1017, 1021 (Ind. 1984); *see also* Indiana Rule of Evidence 603 ("Before testifying, a witness must

---

[3] Mom also notes the sheriff's return did not state that the sheriff had made service by first class mail, as required by the rule. T.R. 4.1(B).

give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience."). And, unlike the case in *Joslyn*, Mother does not admit that she received actual service by sheriff.

[22] There is no evidence to sustain the trial court's finding that, after the service by sheriff, "the attorney for the Petitioners mailed a copy of the Notice of Adoption and the Verified Petition for Adoption to the same address via U.S. Mail as required by Trial Rule 4.1(B)." App. Vol. II at 85. Thus, there was insufficient evidence to support the trial court's conclusion that Mother's consent was irrevocably implied when she failed to file a motion to contest the adoption by July 20, 2018, i.e., thirty days after service by sheriff. However, as we discuss below, we affirm the trial court judgment because the trial court correctly held, in the alternative, that Mother's consent was not required under Indiana law.

## Consent Not Required

[23] Indiana Code Section 31-19-9-8(a) contains additional exceptions to the requirement that a biological parent provide written consent to an adoption. Under that statute, consent to adoption is not required from parents in any one of the circumstances listed in subsections (1) through (12). Here, the trial court concluded that Mother's consent to the adoption was not required under several of the listed circumstances. However, because the statute is written in the disjunctive, "each of the subsections provides an independent ground for dispensing with consent." *R.S.P. v. S.S.* ("*In re Adoption of J.T.A.*"), 988 N.E.2d

1250, 1254 (Ind. Ct. App. 2013), *trans. denied*. Although we agree with the trial court that there may have been sufficient evidence to conclude that Mother's consent was not required under subsections (a)(2)(A) (failure to communicate for at least one year), (a)(2)(B) (failure to provide support for at least one year), and (a)(11) (parent unfit and dispensing with consent in child's best interests), we decide only that Mother's consent was not required because she abandoned Child under subsection (a)(1).

[24] Consent of a parent is not required if she has abandoned or deserted the child for at least six months immediately preceding the date of the filing of the petition for adoption. I.C. § 31-19-9-8(a)(1). "If a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent." I.C. § 31-19-9-8(b). Abandonment is defined as "any conduct by the parent which evinces an intent or settled purpose to forgo all parental duties and to relinquish all parental claims to the child." *In re Adoption of J.T.A.*, 988 N.E.2d at 1254 (citation and quotation omitted). Thus, in *Williams v. Townsend*, for example, we held that an occasional letter or card sent to a child from an incarcerated parent together with one telephone conversation with the child was "token communication" that the trial court properly disregarded when it determined the parent had abandoned child. 629 N.E.2d 252, 254 (Ind. Ct. App. 1994).

[25] Here, Mother did not even engage in token communication with Child in the four years before the Adoptive Parents filed their petition in February of 2018. Mother had no contact whatsoever with Child since she left the Child to the

care of strangers on Mother's Day of 2014. And, even if we conclude that Mother's January 2016 motion to modify the guardianship evinced an intent to assert her parental claims to Child, Mother made no attempt to contact Child in the over two years since her motion was denied. There is no evidence that Mother was prevented by either the courts or Adoptive Parents from having contact or communication with Child, and Mother admitted as much. Further, the evidence established that Mother, who had a car for transportation, knew where Child was living such that she could have gone to that address or at least sent some type of correspondence to that address. She did neither. There was sufficient evidence to sustain the trial court's decision that Mother's consent to the adoption was not required because she abandoned Child for at least the six months prior to the adoption petition.

## Conclusion

[26] There was insufficient evidence to support the trial court's conclusion that Mother's consent was irrevocably implied under Indiana Code Section 31-19-9-18. However, there was sufficient evidence to support the trial court's alternative holding that, even if Mother's consent was not implied, her consent was not necessary because she abandoned Child for at least six months prior to the filing of the adoption petition. I.C. § 31-19-9-8(a)(1). Therefore, we affirm.

[27] Affirmed.

Kirsch, J., and Mathias, J., concur.